```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------x

  UNITED STATES OF AMERICA,

              -against-                       MEMORANDUM & ORDER
                                              21-CR-572(EK)
  CHARLES POWELL,

                      Defendant.

--------------------------------------x
```

ERIC KOMITEE, United States District Judge:

Charles Powell is charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). The charge arises out of law enforcement's investigation of a shooting in Brooklyn on October 7, 2020. The government contends that Powell fired a gun at three individuals, killing one and injuring others, in the course of a robbery.

The defense moves to suppress two categories of evidence: (1) certain physical evidence obtained at the time of Powell's arrest, on the basis that the arrest warrant was the product of a misleading affidavit, and (2) statements Powell

made to law enforcement after his arrest, on the basis that they were the product of un-*Mirandized* custodial interrogation.[1]

## I. Background

After the October 2020 shooting, which occurred at what is alleged to be an illegal gambling location in Brooklyn, the New York City Police Department obtained surveillance footage of the incident.  Affidavit & Complaint in Support of Arrest Warrant Application ("Aff.") ¶ 2, ECF No. 1.  According to the complaint, the footage showed three potential suspects, two of whom fired weapons.  *Id.*  On March 18, 2021, the FBI offered assistance with the investigation.  Memorandum of Law dated June 6, 2022 in Support of Motion to Suppress ("Def. Suppression Br."), Ex. A at 1, ECF No. 40-1.[2]  That same day, Special Agent Erin Dominguez contacted the NYPD with information suggesting that an individual named Brian Castro was involved, and she provided the Instagram account names of other individuals who may have participated.  Def. Suppression Br., Ex. B. at 1, ECF No 40-2.  As of March 24, the NYPD had reviewed

---

[1] The defense also moved to suppress or exclude the identification testimony of Detective Sergeant Daniel Findlay of the Paterson, New Jersey, Police Department on the ground that it was inadmissible under Federal Rules of Evidence 701 and 403, and the result of suggestive identification procedures.  ECF No. 40.  That motion is moot, however, as the government no longer intends to call Sergeant Findlay as a witness.  Gov. Ltr. dated Sept. 6, 2022, at 2, ECF No. 54.

[2] Page numbers in citations to record documents other than deposition transcripts and briefs refer to ECF pagination.

Charles Powell's social media, suggesting that he had become a suspect. Def. Suppression Br., Ex. C at 1, ECF No. 40-3.

Powell is a resident of Paterson, New Jersey. At the time, Daniel Findlay was a Sergeant in the Paterson Police Department and also assigned to the Joint Terrorism Task Force at the FBI's Garrett Mountain Resident Agency. Decl. of Daniel Findlay ¶¶ 2-3, ECF No. 36-2. NYPD officers went to the Garrett Mountain office on April 7, 2021 to show Sergeant Findlay the surveillance video of the shooting. *Id.* at ¶ 8. The record does not reveal precisely why Findlay was selected to view the surveillance footage. Nevertheless, Findlay identified Powell in the video. *Id.*

On October 7, 2021, Magistrate Judge Kuo issued a warrant for Powell's arrest. The warrant application included an affidavit sworn to by NYPD Detective Jeffrey Valenzano describing the footage and shooting. To establish Mr. Powell's identity, Valenzano stated that "Officer-1" — later revealed to be Sergeant Findlay — had identified Powell in the video. Aff. ¶ 3. The affidavit went on to assert that Officer 1 was "familiar" with Powell's appearance based on "numerous prior interactions" with him. *Id.*

Powell was not arrested immediately. Approximately a week after the warrant was issued, however, Powell was in a car accident; the responding officers arrested him pursuant to the

3

warrant and transported him to a nearby hospital in custody. Transcript of May 3, 2022 Suppression Hearing ("Tr.") 110, ECF No. 38. After Powell allegedly attempted to escape the hospital, he was re-arrested and taken to the Clifton, New Jersey, Police Department. *Id.* at 111-12, 115-16. There, while being processed, Powell conversed with Matthew Fernandes, a Clifton police officer, about the alleged escape. *Id.* at 120-30.

Fernandes reported the statements that Powell now seeks to suppress. Fernandes stated that he "believe[d]" that Powell first broached the subject of the escape, by stating that "I could have got away, or oh, I almost got away," but Fernandes could not firmly recall the sequence of the conversation. *Id.* at 129:7-15. Fernandes "asked him how did he get past my coworkers," or words to that effect. *Id.* at 123:17. Powell allegedly responded that he asked a friend to "help him escape from police custody" by waiting for him outside the hospital, *id.* at 124:5-11, but that the plan failed because Powell attempted to flee through a different exit from where his friend was waiting. *Id.* at 112:1-4.

The defense filed its motions to suppress in March 2022, ECF No. 23. At a hearing on May 3, 2022, the government called three witnesses: Sergeant Findlay, Officer Fernandes, and an FBI agent whose testimony related to an issue that is now

4

moot.³ Both parties submitted post-hearing briefs. *See* Def. Post-Hearing Br., ECF No. 40 ("Def. Br."); Gov. Post-Hearing Br., ECF No. 44 ("Gov. Br."). After a conference on August 29, 2022, the parties submitted additional letters on the motions. *See* Def. Ltr. dated Sept. 2, 2022, ECF No. 53; Gov. Ltr. dated Sept. 6, 2022, ECF No. 54; Def. Ltr. dated Sept. 9, 2022, ECF No. 57.

## II. Discussion

### A. Physical Evidence and Statements Obtained Pursuant to the Arrest Warrant

Powell argues that all physical evidence, statements, and observations by law enforcement obtained as a result of the arrest should be suppressed, because the arrest that led to the collection of such evidence was the fruit of Valenzano's affidavit, and that affidavit contained material misstatements and omissions. For the reasons set forth below, this motion is denied.

Detective Valenzano's affidavit described the surveillance footage, stating that "Shooter-2" could be seen firing multiple rounds in areas where cartridge casings were later recovered. Aff. ¶ 2. Valenzano went on to attest that on April 7, 2021, detectives reviewed the surveillance footage

---

³ Special Agent Michael Savona's testimony is no longer relevant because the government has stated that it will not seek to introduce the video of Savona's interrogation of Powell. Def. Br. 42; Tr. 141.

5

along with "Officer-1" (Findlay), a "Federal Task Force member of law enforcement." *Id.* at ¶ 3. To buttress the identification, the affidavit stated that Officer-1 had "numerous prior interactions with Powell and [was] familiar with Powell's appearance," and that Officer-1 had identified Powell as "Shooter-2" in the surveillance video. *Id.*

Powell argues that these statements were false because Findlay was not a "Federal Task Force" officer; because Findlay had not had "numerous prior interactions" with Powell and was not familiar with his appearance; and because Valenzano materially omitted to state that Findlay failed to recognize Powell in a photograph prior to viewing the surveillance video. Def. Br. 34-37.

"[A]n arrest pursuant to a facially valid arrest warrant is presumed to be made with probable cause." *Martinetti v. Town of New Hartford*, 12 Fed. App'x 29, 32 (2d Cir. 2001). One potential exception to this presumption, however, is the so-called *Franks* doctrine, which emerged in the context of search warrants. Under *Franks*, a defendant may contest a warrant by challenging the veracity of the supporting affidavit. *Franks v. Delaware*, 438 U.S. 154, 164-72 (1978).[4] To obtain suppression, the defendant must establish that a "false statement knowingly

---

[4] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits citations and internal quotation marks.

and intentionally, or with reckless disregard for the truth, was included by the affiant in the search warrant affidavit," and that the statement was material to the probable cause determination. *Id.* at 155-56. *Franks* extends to material omissions as well. *See United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003) (questioning whether there were "intentional and material misrepresentations or omissions in [the] warrant affidavit").

"Material" means that "the alleged falsehoods or omissions were necessary to the [issuing] judge's probable cause finding." *Id.* "To determine whether a false statement was necessary to a finding of probable cause," courts "consider a hypothetical corrected affidavit, produced by deleting any alleged misstatements from the original warrant affidavit and adding to it any relevant omitted information." *Ganek v. Leibowitz*, 874 F.3d 73, 82 (2d Cir. 2017).

It remains an open question in this circuit whether the *Franks* doctrine applies to arrest warrants at all. In *Awadallah*, the Second Circuit noted that "[t]he *Franks* doctrine arose in the context of a search warrant, and neither the Supreme Court nor this Court has extended it to arrest warrants." 349 F.3d at 64 n.17 (assuming, without deciding, that *Franks* applied to warrant affidavit for the arrest of a material witness); *see also United States v. Broward*, 594 F.2d

7

345, 350 (2d Cir. 1979) (declining to decide whether district court correctly applied *Franks* to arrest warrant); *Dupree v. United States*, No. 10-CR-0627, 2020 WL 3960512, at *10 (E.D.N.Y. July 13, 2020) (noting that "[i]t is not clear whether *Franks* is applicable to false statements in an arrest warrant affidavit," but assuming it applied).[5]

Even assuming that *Franks* applies here, Powell has not met its standard. I address the three misstatements and omissions that Powell alleges in turn.

*Findlay's "Federal Task Force" Membership.* Powell argues first that the affidavit materially misstated that Officer-1 was a "Federal Task Force Member," because Findlay was not one at the time Valenzano signed the affidavit. Def. Br. 37. Findlay testified, however, that at the time he reviewed the surveillance video, he was indeed assigned to a federal task force, Tr. 23:22-24, and this testimony is essentially undisputed at this point. It is true that Findlay was *no longer* on the task force in October 2021 (when Valenzano wrote the affidavit). But that does not undercut the affidavit's accuracy; the affidavit stated that a "Federal Task Force

---

[5] As the defense notes, some other circuits have applied *Franks* to arrest warrants. *See United States v. Barbosa*, 896 F.3d 60, 68 n.3 (1st Cir. 2018) ("Although *Franks* dealt with an affidavit in support of a search warrant, the same principles apply to an application in support of an arrest warrant where the application serves the same function as an affidavit."); *see also United States v. Colkley*, 899 F.2d 297, 299-302 (4th Cir. 1990); *Wilson v. Stroman*, 33 F.4th 202, 206 (5th Cir. 2022).

member" "*reviewed*" the video on April 7, 2021. Aff. ¶ 3 (emphasis added). In any event, this issue is hardly material, as neither the fact nor the timing of Findlay's task-force status would have altered the finding of probable cause. *See Ganek*, 874 F.3d at 82.

*Findlay's "Interactions" and "Familiarity" with Powell.* Second, Powell argues that Valenzano falsely stated that Officer-1 had "numerous prior interactions" with Powell and was, on that basis, "familiar with Mr. Powell's appearance." Def. Br. 34. On this point, Powell is correct that the affidavit was more aggressively worded than was ideal. But he remains a long way from establishing any intentional or material misstatement.

Findlay testified that he had viewed Powell on approximately ten occasions prior to the identification, with the longest encounter lasting approximately ten minutes. Tr. 26:14-16, 42:5-6. This occurred on July 13, 2019, when Findlay came across detectives who were detaining a group of individuals, including Powell, and Findlay stopped to assist. *Id.* at 30:12-33:25. Findlay had seen Powell "five or six" times prior to July 13, *id.* at 64:17-18, around the same location – a street corner that Paterson police knew to be associated with narcotics trafficking. *Id.* at 33:6-10. Findlay only learned Powell's name that day, however, after witnessing Powell provide

9

his identification to the officers managing the summonsing process on July 13, 2019. *Id.* at 91:25-92:1-3. Following that encounter, Findlay testified, he saw Powell approximately four more times before he viewed the surveillance footage and identified Powell. *Id.* at 63:24-64:65.

The defense contends that this testimony disproves Valenzano's assertions, because Findlay never actually "interacted" with Powell and, aside from July 13, only saw Powell for a few seconds on each occasion. Def. Br. 4-6. Findlay freely conceded that prior to July 13, he had seen Powell for a total of "30 seconds" or less, and that after July 13, he saw Powell for another "30 seconds" in total, in each case from a moving police car. Tr. 63-65. Ultimately, Powell notes, Findlay himself rejected the characterization that he had interacted with Powell, in response to a question from the court:

> THE COURT: Do you have an independent recollection of seeing or interacting with Mr. Powell on July 13th of 2019?
>
> [Findlay]: I specifically didn't interact with him, Judge. I was standing a close distance away from him.

*Id.* at 94.[6]

---

[6] Powell also argues that Findlay was able to offer only a general depiction of Powell's appearance at the suppression hearing, describing him by reference to his size and race. *See* Tr. 95:23. But Powell points to no particularly notable feature, like a beard or tattoo, that Findlay missed.

10

The problem with Powell's argument is that Findlay's testimony more than adequately demonstrated that he was familiar with Powell's appearance. It may be true that "interactions" was too strong a word to use in the affidavit, given that Findlay never spoke to Powell or wrote him a summons, and was not in close proximity to him aside from the July 13 incident. But interacting with someone and knowing what they look like are two different things, and Findlay's testimony established that he had more than sufficient exposure to Powell to know what he looked like when the affidavit was drafted. Ten encounters — even brief ones — are enough to become familiar with a person's appearance.[7]

Sergeant Findlay presented as cautious and candid, freely acknowledging the limits of his history with Mr. Powell. For these reasons, I credit his testimony that he knew what Mr. Powell *looked like* at the time the affidavit was drafted. And the disparity between "interactions," on the one hand, and a more apt word like "encounters," on the other, is simply not

---

[7] Findlay explained why he was inclined to take note when he ultimately learned who Mr. Powell was on July 13, 2019. Findlay testified that Powell stood out to him because of his size, *id.* at 95 (he was a "big individual"); and because Findlay had previously "seen [Powell] out there," on the same street corner in Paterson, which was "a high-crime area known for having narcotics activity and shootings." *Id.* at 33:9-10.

11

material under the standard set out in *Ganek*, 874 F.3d at 82, and prior cases.[8]

Moreover, Findlay's identification was not the only basis for establishing Powell's identity. Valenzano averred that he, too, reviewed the video, and compared the image of Shooter-2 to images extracted from Powell's social media accounts. Aff. ¶ 4. Valenzano relied on this comparison to conclude that Shooter-2's appearance was "consistent with [Powell's] age, race, and appearance." *Id.*

*Findlay's Alleged Prior Failure to Identify Powell.* Third, Powell contends that the affidavit materially omitted to state that Findlay failed to recognize Powell in a photograph prior to viewing the surveillance video. Def. Br. 36-37. But Findlay's testimony – on which this contention is based – did not establish that this failure actually occurred. Instead,

---

[8] There is no inconsistency between this conclusion and the one I previously expressed in response to Powell's motion *in limine* to preclude Sergeant Findlay's identification testimony under F.R.E. 701 and 403. In a telephone conference on August 29, 2022, I expressed substantial doubt as to whether Findlay's experience with Powell made him an appropriate identification witness under Rule 701 (dealing with "lay opinion" testimony), and (relatedly) whether Findlay's testimony would be more probative than prejudicial under Rule 403. Following that conference, the government withdrew its intention to call Sergeant Findlay at trial. But the Rule 701 and 403 questions are very different than the one here: whether Valenzano intentionally or recklessly made a material misstatement by saying Findlay had numerous prior interactions with Powell and was familiar with his appearance. *See, e.g., United States v. Walker*, 974 F.3d 193, 206 (2d Cir. 2020) (requiring district courts to "carefully consider whether to allow lay opinion identification" by probation officers under Rule 701 and 403, given the risk of prejudice); *see also United States v. Allen*, 787 F.2d 933, 936 (4th Cir. 1986) (admissibility of lay-opinion identification testimony from law enforcement officer should turn on whether "there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury").

Findlay's testimony was uncertain, at best, regarding whether he even saw a photo of Powell prior to the video. When the defense asked Findlay whether Special Agent Dominguez "showed you photographs" prior to the video, Findlay responded, "I don't believe they were photographs." Tr. 72:18-21. He could not recall whether he saw one or multiple depictions prior to the video, *id.*, or whether any depiction would have been of Powell or Castro. *Id.* at 73:5-8.

The defense points, in particular, to the following testimony:

> Question [from defense counsel]: So then would it be accurate to say you may have indicated that you recognized Mr. Powell, but you may not have?
>
> [Findlay]: Correct.

*Id.* at 80:6-9. But that testimony merely incorporates the uncertainty described above; it does not establish that Findlay failed to identify Powell. And the defense cites no other evidence of this alleged failure.

Therefore, the defense has not met its burden of showing that Valenzano's affidavit contained a material omission. The motion to suppress evidence obtained pursuant to the arrest warrant is denied.

**B.   Statements to Officer Fernandes**

Next, Powell seeks to suppress statements he is alleged to have made to Officer Fernandes on October 15, 2021.

13

Powell made these statements after he was in a car accident, arrested at the scene thereof, taken to the hospital, re-arrested as he allegedly escaped from the hospital, and taken into custody at the Clifton Police Department. *Id.* at 111-14.

While Powell was handcuffed at the precinct, Fernandes spoke with him. Although Fernandes could not recall the precise order of the conversation, he stated that he "believe[d]" Powell first raised the subject of escape, musing "a few times" that he "could have" gotten away or "almost" got away. *Id.* at 129:12-15. Fernandes testified that he followed up on Powell's comments, asking Powell "how did he get past my coworkers" at the hospital. *Id.* at 123:17, 129:1-15. Powell then allegedly explained that he used his cell phone to contact a friend from the bathroom and asked the friend "to help him escape from police custody," *id.* at 124:11, by "wait[ing] for him at the hospital." *Id.* at 111:23. Powell told Fernandes that the plan was "unsuccessful because he ultimately ran out of the wrong door within the hospital." *Id.* at 111:15-112:2, 126-27.

Prior to custodial interrogation, officers are required to read *Miranda* warnings. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *Rhode Island v. Innis*, 446 U.S. 291, 299 (1980). Here, the government concedes that Powell was in custody when he made the statements at issue, and that no officer read him his *Miranda* rights beforehand. Gov. Br. 15.

14

Therefore, the question is whether his statements were the product of interrogation.

"Interrogation" subsumes "any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Colon*, 835 F.2d 27, 30 (2d Cir. 1987). But "[a] defendant's volunteered, spontaneous statements are admissible notwithstanding the absence of *Miranda* warnings." *United States v. Smalls*, 719 F. App'x 83, 85 (2d Cir. 2018), *as amended* (Apr. 20, 2018); *see, e.g.*, *United States v. Carr*, 63 F. Supp. 3d 226, 238 (E.D.N.Y. 2014) (unsolicited statement from defendant that "you got me" was spontaneous). The "[g]overnment has the burden of proving by a preponderance of the evidence that a defendant made his statements spontaneously and not as the result of custodial interrogation." *United States v. Choudhry*, 24 F. Supp. 3d 273, 279-280 (E.D.N.Y. 2014), *aff'd*, 649 F. App'x 60 (2d Cir. 2016); *see also United States v. Alleyne*, No. 20-CR-00266, ECF No. 39 at 19 (E.D.N.Y. Nov. 23, 2021).

The government argues that Fernandes was merely following up on Powell's own spontaneous statements. Gov. Br. 17-18. It is true that "[c]ourts have . . . allowed law enforcement officials to ask reasonable follow-up questions to volunteered statements without first giving the suspect his

15

*Miranda* rights." *United States v. De Santis*, No. 00-CR-829, 2000 WL 1863538, at *4 (S.D.N.Y. Dec. 20, 2000). But those follow-up questions are limited to *clarifying* questions: "neutral efforts to clarify what has already been said," as opposed to "questions seek[ing] to expand the scope of volunteered statements." *United States v. Rommy*, 506 F.3d 108, 133-34 (2d Cir. 2007).

In *De Santis*, for example, the court held that after the defendant said he "knew" he was going to be arrested, the officer was permitted to "simply follow[]-up by asking how [defendant] knew." 2000 WL 1863538, at *4. And in *Turner v. Sullivan*, the court held that an officer's question about how the suspect had hurt his leg was a "natural response" to petitioner's remark that his leg hurt. 661 F. Supp. 535, 538 (E.D.N.Y. 1987), *aff'd*, 842 F.2d 1288 (2d Cir. 1988); *see also Andersen v. Thieret*, 903 F.2d 526, 531-32 (7th Cir. 1990) (rejecting *Miranda* challenge when, in response to suspect's statement that "I stabbed her," police asked, "Who?"); *United States v. Rhodes*, 779 F.2d 1019, 1032 (4th Cir. 1985) (officer was permitted to ask "why?" when defendant told officer he could not seize his notebook).

The government cannot successfully invoke this line of cases about mere clarification because it cannot establish — at least not with any precision — what Fernandes asked and in

16

response to what statement he asked it. Fernandes testified that he was responding to a remark by Powell, but he could not recall exactly what Powell had said: "I believe . . . he was mentioning that a few times, like oh, I could have got away, or oh, I almost got away, or something along those lines." Tr. 129:12-15. These statements are different from one another: "I could have got away" conveys that escape was possible, but not that Powell had attempted it; "I almost got away" conveys an actual attempt. Fernandes's follow-up question about "how" Powell did so presumes the latter. Given the disparity, we cannot say with confidence whether Fernandes was merely seeking clarification or, alternatively, expanding on the scope of what Powell had volunteered. *See Rommy*, 506 F.3d at 133-34.

Moreover, Fernandes declined to rule out the possibility that he (or other officers) might have asked Powell other questions even before Powell's musings. Fernandes testified as follows:

> Question [from defense counsel]: You don't really remember exactly what you said to Mr. Powell prior to you asking the question about how you got past my coworkers?
>
> [Fernandes]: I don't recall the — the entirety of the conversation, no.

Tr. 130:3-7. Likewise, Fernandes candidly acknowledged that he had learned about Powell's escape attempt prior to this discussion with Powell, and that he had been "curious" about how

17

it happened.  *Id.* at 130:8-23.  That acknowledgment raises the possibility that Fernandes could have broached the issue first, given his admittedly uncertain recollection.

For these reasons, the government has not carried its burden of establishing that the un-*Mirandized* statements at issue were truly spontaneous.  Powell's motion to suppress his statements to Officer Fernandes concerning the alleged escape is granted.

### III. Conclusion

Defendant's motion to suppress the evidence obtained pursuant to the arrest warrant is DENIED.  Defendant's motion to suppress his statements to Officer Fernandes is GRANTED.


SO ORDERED.


    /s/ Eric Komitee
ERIC KOMITEE
United States District Judge

Dated:    October 11, 2022
          Brooklyn, New York