UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

..............................X:

UNITED STATES OF AMERICA   :

                                   :   Case No. 1: 21-Cr-00572(EK)

      v.                  :

                                  :

CHARLES POWELL, Defendant.  :

..............................X:

# DEFENDANT CHARLES POWELL'S FEDERAL RULES OF CRIMINAL PROCEDURE 29 MOTION FOR JUDGMENT OF ACQUITTAL

Dated : June 9, 2025

On the Brief:  Charles Powell
Registration No. 83949-053
MDC Brooklyn
80 29th Street
Brooklyn, New York 11232
*Pro Se*

Defendant Charles Powell, appearing pro se, respectfully moves this Court for a judgment of acquittal on all counts of the Superseding Indictment pursuant to the Federal Rules of Criminal Procedure 29(a), as the government has failed to present sufficient evidence to sustain a conviction on any of the charges beyond a reasonable doubt.

## I. LEGAL STANDARD

Fed. R. Crim. Proc. 29 requires the Court to enter a judgement of acquittal if the evidence presented at trial, viewed in the light most favorable to the government, is insufficient to sustain a conviction. A conviction cannot be based on speculation, conjecture, or unreliable testimony, and the evidence must support a rational finding of guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *United States v. Lorenzo*, F.3d 153, 159 (2d Cir. 2008).

The Second Circuit has repeatedly emphasized that a Rule 29 motion must be granted when no rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (A jury cannot infer guilt unless the evidence is substantial, conclusive, and free from undue speculation). *United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005) (explaining that if a verdict is based on inferences so tenuous that no rational fact finder could find guilt beyond a reasonable doubt, acquittal is required). Here, the government has failed to meet this burden for each count of conviction.

## II. THE GOVERNMENT FAILED TO PROVE CONSPIRACY TO COMMIT HOBBS ACT ROBBERY AND HOBBS ACT ROBBERY UNDER 18 U.S.C. § 1951(a) CHARGED IN COUNTS ONE AND TWO OF THE SUPERSEDING INDICTMENT, AS WELL AS COUNTS THREE AND FOUR, WHICH DEPEND UPON A CONVICTION OF COUNTS ONE AND TWO.

To convict Powell under the Hobbs Act, the government was required to prove: (1) the commission of a robbery; and (2) an effect on interstate commerce. The government's evidence is legally insufficient to establish either element beyond a reasonable doubt.

1

A. <u>There Was a Lack Of Proof Of an Effect on Interstate Commerce</u>

The government relied on the "depletion-of-assets" theory, to prove an effect on interstate commerce. To sustain a Hobbs Act conviction under the "depletion-of-assets" theory, the government must establish more than a mere location of the offense or a group of individuals present at the scene. It must prove (1) that the victim of the robbery was an actual business entity, (2) engaged in interstate commerce, and (3) that the robbery, if completed, depleted the business's assets, or, if only conspired to or attempted to be completed, the assets of the business would have been depleted, in a manner affecting interstate commerce. Mere speculation or general allegations of illicit activity are insufficient.

In this case, the government alleged that the victim of the robbery was an illegal gambling business allegedly operating at 181 Hegeman Avenue, Brooklyn, New York. However, the evidence introduced at trial was legally insufficient to establish the existence of a business, let alone that such a business was the target and victim of the robbery. The failure to prove the existence of a business entity or its connection to interstate commerce is fatal to the government's case.

1. <u>The Government Failed to Establish a Business Existed at 181 Hegeman Avenue</u>

The record is devoid of any evidence demonstrating that an actual business legal or illegal was operating at 181 Hegeman Avenue. The government failed to elicit testimony or introduce any evidence establishing:

(i) Who owned, managed or operated the alleged business: No individual was identified as an owner, runner or manager. No evidence showed a unified group of individuals or even a single individual conducting any form of operations.

(ii) Testimony from anyone associated with the business: The government did not call any witness affiliated with the alleged gambling operation to testify about the business' purpose, practices, day-to-day operations or to confirm that there was in fact a business.

(iii) That the alleged business engaged in any ongoing activity consistent with a business: There was no evidence showing if and how the alleged business made money, the services it provided to its patrons, regular operations, scheduling or any form of structural organization. The jury was not presented with any evidence establishing that the alleged business was ran with sufficient regularity for it to be considered an on going business rather than a casual non-business activity. The government made no effort to show whether the business operated everyday, on any specific day(s) of the week, only on weekends, weekly, or bi-weekly and the business hours of such operations. Although Myhand mentions going to 181 Hegeman in 2019 and the charged crime occurred October 7, 2020, there was no evidence the alleged business was operating the entire time in between or how it operated during that time frame.

(iv) That the alleged business met the definition of an "illegal gambling business" under 18 U.S.C. § 1955(b)(1). As required by Section 1955(b)(1), no evidence showed that the alleged gambling operation violated state law, involved five or more persons and had been or remained in substantially continuous operations for a period in excess of thirty days or generated over $2,000 in gross revenue on a single day. Although not required for a Hobbs Act conviction, the government's inability to present sufficient evidence capable of satisfying this low hurdle further demonstrates how it failed to establish a business existed in the instant case.

(v) That anyone was convicted of operating an illegal gambling business under Section 1955 in connection with 181 Hegeman. Such a conviction would have provided concrete evidence of the existence of a commercial enterprise. No such conviction was introduced at trial.

The absence of this foundational evidence means that no reasonable juror could find beyond a reasonable doubt that an actual business existed, as required to sustain a Hobbs Act conviction under a depletion of assets theory.

2. <u>The Government Failed to Prove That the Business Was the Victim of the Robbery and Had Its Assets Depleted</u>

Even assuming arguendo that a business did exist at 181 Hegeman, the government failed to show that the business, rather than private individuals, was the victim of the robbery or that it had its assets depleted. There was no evidence that the property allegedly taken during the alleged robbery belonged to the business.

Cooperating witness Shamel Myhand only testified that he allegedly took $1,200 from an individual inside of 181 Hegeman. He did not explain who the money belonged to, whether it was connected to the business or how the person who possessed the money intended to use it. Myhand did not describe stealing money from the business, nor did he explain whether the alleged gambling proceeds, if any, were taken from business custody. The government did not call the individual Myhand allegedly robbed to provide an explanation as to who the money belonged to or the intended use of such money. Brian Castro's account of allegedly taking $20,000 in the Gomez recording, (Ex. 245-T-1), fails to identify the source or ownership of the money. There was no evidence this sum was seized from the business or that it was tied to its operations. Notably, the prosecution presented no corroboration that the amount was actually taken or that it was in the possession of any commercial entity.

Viewing this evidence in the light most favorable to the government, at best, it only shows that $21,200 was stolen. However, without evidence showing that the money allegedly taken belonged to or was in the possession of the alleged business, no reasonable juror could

conclude beyond a reasonable doubt that the alleged illegal gambling business was the victim of the robbery and had its assets depleted.

3. The Government Failed to Establish That the Alleged Business Engaged in Interstate Commerce

Furthermore, the government alleges that the business run at 181 Hegeman was a gambling business. Meaning its principal objective would have been to generate a profit from gambling activity, which does not require the business to be engaged in interstate commerce and the government did not present sufficient evidence that it did. The trial records demonstrates that no business records, tax filing, receipts, financial transactions nor testimony were produced establishing that alcohol sales or any other commercial activities were taking place on October 7, 2020; or any goods, services, or transactions affecting commerce were occurring at or near the time of the incident.

The government's only evidence suggesting that commercial activity occurred was the vague testimony of Shamel Myhand, who stated during direct that Heineken was sold at 181 Hegeman (Trial Tr. at 372: 17) and when asked about his experiences at 181 Hegeman prior to both robberies, he said that at an unspecified prior visit "other people" purchased Heineken (Trial Tr. at 411: 5)[1]. However, Myhand admitted during cross-examination that the 10 times he had

---

[1] Myhand was asked by the government and he answered as follows:

Q.:     What did you do on the occasions when you went inside 181 Hegemen prior to either robbery?

A.:     Well, the majority of the time I went there, I bought a weed bag. I used to sell weed. I probably bought an ounce of weed maybe once or twice. I gambled no more than two times there.

Q.:     And when you would buy weed, where in the establishment would you buy the weed?

A.:     From right behind the second door.

5

been to 181 Hegeman were all before the 2019 robbery and that from the time of the 2019 robbery until October 7, 2020, he had not gone back (Trial Tr. at 489: 6-8). As Myhand did not testify to seeing alcohol sales occur on October 7, 2020, this admission shows that any information about the business and observations of alcohol sales Myhand mentioned, derived from over a year prior. Past observations from over a year ago has no probative value to

---

Q.: And when you gambled in there a couple of times, what gambling games did you engage in?

A.: I played Cee-lo once and shooting pool.

Q.: And were there times that you were inside of that location where you observed pool or Cee-lo being played?

A.: Yes.

Q.: And on those occasions where either you were playing or observing, what is the lowest amounts of money you saw being gambled?

(Objections omitted).

A.: I seen a person shoot pool a dollar a ball, something like that, the lowest.

Q.: And when you were there, what was the --either playing or observing, what was the highest amount you saw gambled?

A.: I seen about 30,000.

Q.: You mentioned that on occasion you had purchased Heinekens inside. When you were there were other people inside purchasing beers?

A.: Yes.

Q.: What kind of beers?

A.: Heineken.

Q.: Now on the night of the robbery, October 7, 2020, you had testified that Mecca had handed you a pistol.

    On that night, where did he retrieve it to hand it to you?

A.: From his hip.

(Trial Tr.: 409:24 to 411:14).

Clearly, Myhand testified about his experiences prior to the robbery on October 7, 2021 and not the night in question. The transition to the night in question occurred at Trial Tr: 411: 10-14).

establish whether the alleged business was engaged in interstate commerce at the time relevant to the indictment.

In addition to being outdated, Myhand's testimony fails to establish three critical facts necessary to support the conclusion that the alleged business was engaged in interstate commerce:

(i) Who was selling alcohol: Myhand never testified that the alleged illegal gambling business was the entity responsible for selling the alcohol at 181 Hegeman. He provided no clarification as to the whether the alcohol was sold by the operators of the gambling den, by individual patrons or by an unaffiliated party. Without identifying the seller, the government cannot show that any commercial alcohol transaction was attributable to the alleged business itself.

(ii) The frequency of alcohol sales: Myhand failed to describe how often alcohol was sold at 181 Hegeman. He did not testify that it was sold regularly or consistently. Even if alcohol had been sold once, a single isolated sale, if not part of a continuous commercial practice, cannot establish that the alleged business was "engaged in commerce." As mentioned above, the government alleges that the type of business run was a gambling business. Although such a business is capable of selling alcohol, it is not required. Frequency is essential to show that any sales were part of the regular course of business.

(iii) Whether the alleged business customarily purchased alcohol for resale: Myhand's testimony fails to establish whether any proceeds or assets of the alleged gambling operation were used to customarily purchase alcohol for resale. The government did not introduce evidence showing that any business expense was incurred to support alcohol sales, or the business treated alcohol as a commercial commodity. Without a showing of this nexus, the sale of alcohol if any occurred cannot be tied to the business in a manner sufficient to a support a Hobbs Act conviction.

Because Myhand's testimony did not identify the alleged gambling business as the seller of alcohol, establish that the selling of alcohol was a continuous commercial practice of the alleged business, prove that the alleged business customarily purchased alcohol for resale and was based on outdated information and observations, it is legally insufficient to establish that the alleged gambling business was engaged in interstate commerce. Viewing Myhand's testimony in the light most favorable to the government, at most it shows that at some point in 2019 alcohol was sold at 181 Hegeman. Even if alcohol was sold by the business in the past, the government must prove that commerce was occurring or was affected on or near October 7, 2020, not

sometime in 2019 or earlier. Testimony about past commercial activity does not support a finding of an effect on commerce at the time of the offense, "even if we view the time frame charged in the indictment very broadly, the effect on Gettysburg (the business entity in this case) falls well outside those dates. Thus, unlike in the first trial, the effect on Gettysburg can not form the basis for Hobbs Act jurisdiction." *United States v. Perrotta*, 313 F.3d 33, 40 (2d Cir. 2002).

As the government failed to prove that the selling of alcohol was a continuous commercial practice of the alleged gambling business, that it customarily purchased alcohol for resale, and that such activity was being conducted at the time of the offense, no reasonable juror could conclude beyond a reasonable doubt that the alleged illegal gambling business was engaged in interstate commerce.

4. Conclusion

In sum, the government's failure to prove an effect on interstate commerce is underscored by comparing this case to those where the courts have upheld Hobbs Act convictions based on specific, credible evidence of ongoing commercial activity and the impact of the robbery on that commerce:

- In *United States v. Wilkerson*, 361 F.3d 717 (2d Cir. 2004), the Second Circuit upheld a Hobbs Act conviction where the owner of a landscaping business testified that the company regularly purchased supplies that had traveled in interstate commerce, the items shown in photographs taken shortly after the robbery were business supplies, and the money stolen was earmarked for additional purchases for the business.

- In *United States v. Griffin*, 724 F. App'x 808 (11th Cir. 2018), the court found sufficient evidence where the owner of a bar testified that he routinely ordered Miller Lite, Coors Lite, and Heineken, all of which had traveled in interstate commerce. The government also produced invoices and testimony from a supplier confirming those transactions, and the bar owner stated that the money stolen would have been used to further his business.

- In *United States v. Elias*, 285 F.3d 183 (2d Cir. 2002), the court upheld a Hobbs Act conviction where the manager of a grocery store testified that the store sold beer brewed in Mexico and the Dominican Republic, and fruit from Florida and California. The business

8

"stocked" out-of-state goods, and the robbery impaired the store's ability to draw from those interstate supply chains.

Here, by contrast no such evidentiary showing was made. The government failed to produce testimony from any person affiliated with the alleged gambling business at 181 Hegeman. No one testified that the alcohol observed in the post-incident photographs belonged to the alleged business or was being sold to customers. In this case, there was:

- No evidence of any business assets being stolen;

- No proof that the money allegedly taken was intended for use in furtherance of the alleged business;

- No receipts, testimony or invoices establishing that the alleged business regularly purchased alcohol for resale or any other ongoing commercial activity;

- No proof of alcohol sales occurring on or near the date of the incident;

- And most critically, no evidence demonstrating that an on-going business existed at the time of the offense, let alone one engaged in commerce.

This total evidentiary void renders the Hobbs Act commerce element unproven, and no rational juror could find that the alleged robbery affected [or would have affected] interstate commerce beyond a reasonable doubt.

Accordingly, the I respectfully request that the Court grant this Rule 29 motion and enter a judgement of acquittal on Counts One and Two which, under the depletion of assets theory, required proof an illegal gambling business actually existed, was engaged in interstate commerce and had its assets depleted, in order to to prove an effect on interstate commerce. Since Counts Three and Four presuppose a conviction on Count Two, the Court should also enter a judgment of acquittal on those counts.

B. <u>The Evidence Of an Actual Robbery Was Insufficient to Support a Conviction</u>

The government failed to present direct evidence that Powell took money or property. No physical evidence, such as stolen items, was recovered linking Powell to the alleged robbery. The surveillance footage fails to identify Powell as a participant in any robbery, rendering the government's case speculative at best. The alleged confession was never corroborated.

The government's proof of the commission of a robbery under the Hobbs Act rested solely on the testimony of cooperating witness Shamel Myhand, who claimed during trial that he took money from an individual who was inside the alleged illegal gambling operation at 181 Hegeman Avenue. There was no physical evidence, no video footage, and no witness testimony to corroborate this alleged theft. Notably, no currency or proceeds were recovered, and Myhand's account was not supported by any independent evidence, surveillance, or admissions from other alleged participants. The government offered no bank records, no business ledgers, no surveillance confirmation, and no identification of who the money allegedly belonged to.

This kind of uncorroborated accomplice testimony is inherently suspect, and while not legally inadmissible on its face, it is constitutionally insufficient to support a conviction when it is uncorroborated, internally inconsistent, and contradicted by the record as it is here.

The Second Circuit has made clear that although a conviction may be based on accomplice testimony, that testimony must be credible, and courts must exercise heightened scrutiny when a cooperating witness stands to benefit from testifying:

- "Although uncorroborated accomplice testimony may suffice to support a conviction, such testimony should be examined with special caution, particularly when the accomplice has an incentive to testify falsely." *United States v. Diaz*, 176 F.3d 52, 92 (2d Cir. 1999).

- "While it is well settled that accomplice testimony need not be corroborated to support a conviction, such testimony must still be credible. If the testimony is internally

10

- inconsistent or contradicted by the record, a jury may not rationally rely on it." *United States v. Wallach*, 935 F.2d 445, 471 (2d Cir. 1991).

- "A conviction may be based on the testimony of a single accomplice or cooperator, so long as the testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt." *United States v. Parker*, 903 F.2d 91, 97 (2d Cir. 1990).

- "The mere fact that a conviction is supported only by the testimony of cooperating witnesses does not render it infirm, but this Court has made clear that testimony from such sources must be viewed with caution." *United States v. Triumph Capital Group, Inc.*, 544 F.3d 149, 161 (2d Cir. 2008).

Here, Myhand's claim that he "took money" is the only evidence of a robbery, a required element of the Hobbs Act robbery offense. But, his statement was uncorroborated, vague, and unsupported by any physical or circumstantial evidence. No other witness testified to observing a theft or seeing Myhand in possession of cash. His incentive to cooperate with the government for sentencing benefits further undermines the reliability of his account.

In this context, the Second Circuit's warnings are especially relevant: a conviction cannot rest on such speculative, incentive-driven, uncorroborated testimony without violating due process and the Rule 29 standard. Accordingly, the Hobbs Act robbery charge (Count Two) must be dismissed.

## III. THE GOVERNMENT FAILED TO PROVE UNANIMOUS POSSESSION OF ALL THREE CARTRIDGES LISTED IN THE INDICTMENT

A. <u>A Unanimous Verdict Requires Agreement of Possession of All Three Cartridges</u>

Count Five of the indictment charges Powell with violating 18 U.S.C. § 922(g)(1), alleging that he "did knowingly and intentionally possess in and affecting commerce ammunition, to wit: three .380 caliber cartridges (two Federal and one Perfecta)." (Superseding Indictment, Count Five). The government did not charge three separate counts or allege that possession of all three cartridges was necessary to violate Section 922(g); however, it relied on

the existence of all three in its theory of guilt and did not instruct the jury that it could convict if it found possession of any one of them beyond a reasonable doubt.

It is well established that a conviction under Section 922(g) requires proof that the defendant knowingly possessed any ammunition while being a convicted felon. Possession of a single round of ammunition by a felon is sufficient to violate Section 922(g)(1). However, when the government specifies a finite set of factual items in the indictment (here, three distinct cartridges), and the court fails to instruct the jury that it must be unanimous on which specific item the defendant possessed, the risk of a non-unanimous verdict arises, in violation of the Sixth Amendment.

As the Second Circuit has explained, a general guilty verdict cannot stand when "a jury could convict without agreeing on the factual basis of the verdict." *United States v. Natelli*, 527 F.2d 311, 325 (2d Cir. 1975). Likewise, in *United States v. Schiff*, 801 F.2d 108, 114 (2d Cir. 1986), the court emphasized that where the indictment alleges multiple factual acts and the jury is not instructed to agree on any specific one, a conviction may not constitutionally stand if there is a "genuine possibility of jury confusion or disagreement."

Here, the indictment expressly alleged three distinct rounds of ammunition, but the jury was not instructed that it had to unanimously agree that Powell possessed the same cartridge, nor was it instructed that possession of just one would suffice. If, for instance, some jurors found possession of the Federal cartridges and others found possession of the Perfecta cartridge, the verdict may have been non-unanimous, in violation of *Richardson v. United States*, 526 U.S. 813 (1999), and *United States v. Dhinsa*, 243 F.3d 635, 674 (2d Cir. 2001).

Further, the government presented no forensic, testimonial, or surveillance evidence that Powell possessed any of the three cartridges. A conviction for possession under Section 922(g)

12

requires more than proximity or speculation, it requires affirmative proof of dominion or control, which is wholly lacking here.

B. <u>There Was Insufficient Evidence of Knowing Possession</u>

To sustain a conviction under 18 U.S.C. § 922(g)(1), the government must prove beyond a reasonable doubt that:

(i) The defendant was a convicted felon;

(ii) The defendant knowingly possessed a firearm or ammunition; and

(iii) The possession was in or affecting interstate or foreign commerce.

As to Count Five, the government alleged that Powell knowingly possessed three .380 caliber cartridges: two manufactured by Federal and one by Perfecta. The government's proof of possession relied on:

(i) Surveillance video footage;

(ii) Testimony from Detective Constantina Deluca, who recovered the shell casings two days after the incident; and,

(iii) Ballistics Expert Robert Bustamante.

When reviewed under the standard articulated in *Jackson v. Virginia*, 443 U.S. 307, 318-319 (1979), which requires a rational juror to find each essential element of the offense beyond a reasonable doubt, the government's proof fails. The prosecution failed to establish Powell's actual or constructive possession of any of the three cartridges nor did it reliably link any of them to Powell through witness testimony, forensic analysis, or physical evidence.

1. <u>No Evidence Tied Powell to the .380 Perfecta Cartridge Recovered From the First Room</u>

Detective Deluca testified that a Perfecta .380 shell casing was recovered from the first room of 181 Hegeman, alongside a 9mm casing and a deformed bullet. Although surveillance

13

footage depicted an individual, allegedly Powell, inside that room holding what appeared to be a firearm, the video did not show the firearm being discharged -- no muzzle flash, recoil or shell ejection was visible. There is no footage of Powell firing a weapon, let alone a .380 caliber firearm. More importantly, no witness testified to seeing Powell discharge a firearm in the first room. Shamel Myhand, who was present in the first room throughout the incident and admitted to shooting the victim twice in the chest (Trial Tr. at 379, 381, 384), never testified that Powell fired a gun. Even assuming Powell did fire a weapon, the presence of a 9mm shell casing in the same room introduces reasonable doubt as to whether the Perfecta .380 cartridge was fired by Powell, as opposed to someone else. No witness directly testified that Powell had a .380 caliber firearm the night of October 7, 2020 and no DNA, fingerprints, or firearm was recovered to link Powell to the Perfecta casing. Notably the government offered no evidence proving that any of the casings recovered were connected to the October 7 offense.

2. <u>No Evidence Linked Powell to the Federal .380 Cartridge Found in the Third Room</u>

The second cartridge, a Federal .380 casing "Federal-A", was allegedly found in the third room of 181 Hegeman. However, the government presented:

(i) No witness testimony from anyone present in that room;

(ii) No surveillance footage showing Powell firing a weapon in the third room; and,

(iii) No forensic evidence linking Powell to the casing.

As mentioned above, no witness testified that Powell possessed a .380 caliber firearm on the night of the incident and no .380 caliber firearm was recovered to link Powell to the alleged shooting. The complete absence of testimonial video, forensic, or physical proof renders the government's own claim that Powell possessed the cartridge in the third room entirely speculative and, thus, legally insufficient.

14

### 3. The Backyard Cartridge Was Forensically and Factually Unconnected to Powell

The third cartridge, another Federal .380 casing, "Federal-B," was allegedly recovered from the backyard area. The surveillance footage allegedly shows an individual firing a gun in the backyard, but:

(i) The video does not confirm the caliber or type of weapon used;

(ii) The footage does not show ejected shell casings; and,

(iii) The government offered no expert testimony or physical evidence linking the cartridge found to the firearm seen in the video.

Detective Deluca admitted she did not know whether any of the shell casings were connected to the commission of the crime (Trial Tr. 181: 13), and how or when the cartridges arrived at the scene (Trial Tr. at 205). These admissions fatally undermine the probative value of the backyard casing. The government failed to establish a temporal nexus between the recovery of the shell casing and the October 7 offense. Without evidence proving that the cartridge was discharged on the night of the robbery, much less by Powell, there is no basis upon which a rational juror could find knowing possession.

### 4. Expert Testimony Failed to Establish a Reliable Link Among the Three Cartridges or to Powell

The government's ballistics expert, Robert Bustamante, further undermined the government's theory. He testified that:

(i) Two cartridges (Items 9 and 10, both Federal) could be matched as having been fired from the same firearm; and.

(ii) The third cartridge (Item 6, Perfecta) was inconclusive, as it lacked sufficient individual characteristics for comparison. Bustamante testified: "They were inconclusive, meaning that there was an agreement of class characteristics, but the individual characteristics there wasn't enough for me to interpret it being fired from the same gun or not." (Trial Tr. at 765:10-15)

15

This admission is fatal. Because the indictment charges all three cartridges as part of a single possession offense, the jury was required per the Court's instructions to find knowing possession of all three specific cartridges. The government's own expert could not conclude that the Perfecta casing came from the same firearm, undermining the integrity of the charge. Even more troubling is that Bustamante's testimony was internally contradictory. He admitted: "There's only one way I can determine if [a casing] was fired from the same gun. That I would have to have a firearm in which we would generate test fires." (Trial Tr. at 754:1-4).

No such firearm was recovered. Despite this, Bustamante still claimed items 9 and 10 were fired from the same gun, a conclusion that violates his own stated methodology. Such testimony fails under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), which requires that expert conclusions be based on reliable methods and principles. Without a firearm to conduct test fires, and without adherence to scientific protocol, Bustamante's conclusions are speculative and inadmissible to establish guilt beyond a reasonable doubt.

5. The Government Failed to Prove Actual or Constructive Possession

To convict under Section 922(g), the government must prove either actual or constructive possession, meaning that the defendant had the power and intention to exercise dominion and control over the ammunition. Here:

(i) Powell was never seen handling any of the cartridges;

(ii) There was no physical possession or exclusive control over the spaces where the casings were found; and,

(iii) There is no evidence Powell had knowledge of the presence of any of the .380 cartridges, nor the intent to control them.

This falls short of the threshold for constructive possession, particularly in a shared space with other armed individuals, including Shamel Myhand, who admitted to firing a weapon.

6. <u>Conclusion</u>

The government failed to prove that Powell knowingly possessed any of the three .380 caliber cartridges charged in Count Five:

(i) The Perfecta casing found in the first room was never tied to him;

(ii) The Federal-A casing found in the third room lacked any connection to Powell;

(iii) The Federal-B casing found in the backyard was temporally and forensically unlinked to him.

The evidence presented was speculative, lacked foundational reliability and failed to establish actual or constructive possession. The government's case rest on circumstantial inferences from ambiguous evidence, which is clear from Second Circuit precedent, cannot sustain a conviction beyond a reasonable doubt, "Where a fact to be proved is also an element of the offense . . . it is not enough that the inferences be permissible. We must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that element beyond a reasonable doubt." *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995). "A conviction must rest on firm evidence of guilt beyond a reasonable doubt, not on the piling of inference upon inference or on a speculative hypothesis." *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994). *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) (The court reiterated that speculation and inference cannot substitute for proof beyond a reasonable doubt). Accordingly, because the government failed to prove beyond a reasonable doubt that Powell possessed any one of the three cartridges, let alone all three as charged, and the jury was not instructed that possession of any one sufficed, the Court, as a matter of law, must enter a

judgment of acquittal on Count Five for lack of sufficient evidence of possession and to protect the constitutional right to a unanimous jury verdict.

## IV. CONCLUSION

As a result of the forgoing, I respectfully request that the Court enter a judgment of acquittal on Counts One, Two, Three, Four and Five due to the insufficiency of the evidence to prove those charges, and I also respectfully request that the Court dismiss those counts with prejudice.

Respectfully submitted,

/s/ Charles Powell
Charles Powell, Pro Se
MDC Brooklyn
Brooklyn, NY